Case 7:21-cv-03652-PMH Document 1-60 Filed 04/23/21 Page 1 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | |
|---|---|
| NRO BOSTON LLC, NRO EDGARTOWN LLC, JASON INDELICATO and ALICE INDELICATO, individually and on behalf of all those similarly situated, | Index No.: 037005/2019 |
| Plaintiffs, | **SUMMONS** |
| | DATE FILED: January 19, 2021 |
| v. | Plaintiffs designate Rockland County as the place of trial |
| YELLOWSTONE CAPITAL LLC; DAVID GLASS; YITZHAK STERN; AND THE JOHN AND JANE DOE INVESTORS, | The basis of venue is the location where the related Judgment by Confession was filed. |
| Defendants. | |

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within thirty (30) days if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
       January 19, 2021

**WHITE AND WILLIAMS LLP**

By:_____
Shane R. Heskin
7 Times Square
New York, NY  10036
(215) 864-7165
*Attorneys for Plaintiffs*

Case 7:21-cv-03652-PMH Document 1-60 Filed 04/23/21 Page 2 of 44

TO: Yellowstone Capital, LLC
One Evertrust Plaza
Jersey City, New Jersey 07302

David Glass
200 E. Las Olas Blvd, STE 1600
Fort Lauderdale, FL 33301

Yitzhak D. Stern
220 Surrey Rd.
Hillside, NJ 07205

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

---

NRO BOSTON LLC, NRO EDGARTOWN
LLC, JASON INDELICATO and ALICE
INDELICATO, individually and on behalf of all
those similarly situated,

                    Plaintiffs,

     v.

YELLOWSTONE CAPITAL LLC; DAVID
GLASS; YITZHAK STERN; AND THE JOHN
AND JANE DOE INVESTORS,

                    Defendants.

Index No.: 037005/2019

---

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs NRO Boston, NRO Edgartown (collectively "NRO"), and Alice Indelicato
("Indelicato" together with NRO, the "Plaintiffs"), by and through their undersigned attorneys,
individually and on behalf of all others similarly situated, allege as against Defendants as
follows:

## NATURE OF THE ACTION

1.     This action seeks to save small business owners and their families from the
predatory lending practices of Defendants.

2.     Between February 23, 2016 and June 29, 2016, Plaintiffs paid Defendants a
staggering $635,208 in interest in just four months.  The interest rates were as high as 620%.

3.     Defendant Yellowstone Capital, LLC ("Yellowstone"), which is led and/or
directed by Defendants David Glass, and Yitzhak Stern, is one of the largest merchant cash

INDEX NO. 037005/2019
RECEIVED NYSCEF: 01/19/2021

advance ("MCA") companies whose entire scheme preys upon struggling small businesses (the "Enterprise").

4. The Enterprise provides funds to Plaintiffs, and other small businesses, through instruments that purport to be asset purchase agreements. In actuality, these transactions are unquestionably loans. The Enterprise, however, cannot call these transactions what they are (loans) because the whole point of its scheme is to evade the usury laws of various states, including New York. Thus, in order to charge the unlawful and unconscionable interest rates it seeks to impose, the Enterprise must call the transaction by a different name.

5. Under a legitimate asset purchase agreement, however, all rights, title and interest are transferred to the purchaser, and the purchaser assumes all risk of non-collection. In contrast, the *sine qua non* of a loan is the absolute repayment of the money advanced.

6. Despite the paper form of the transactions, the Enterprise treats the transactions as absolutely repayable loans.

7. To be sure, since 2012, the Enterprise has filed more than 6,000 confessions of judgment against small businesses that did not generate sufficient receipts to make their required fixed daily payments.[1] That is not the transfer of risk.

8. The conduct by the Enterprise has resulted in a national epidemic that has sparked the attention of Governor Cuomo, the New York State Legislature, the New York Attorney General, the Manhattan District Attorney, the New Jersey Attorney General, the Federal Trade Commission, and the United States Congress. The Enterprise is a primary target.[2]

9. Indeed, the Attorney General of New Jersey, Yellowstone's home state, has brought suit against Yellowstone and its associated companies, directly alleging that

---

[1] *See* www.bloomberg.com/confessions-of-judgment.com, last visited Oct. 25, 2018; Ex. 1.
[2] *Id.,* .

Yellowstone engages in the practice of "[c]harging unlawful interest rates on small business loans disguised as purchases of receivables." Complaint, *Grewal v. Yellowstone Capital LLC et. al*, Civil Action No. _ (N.J. Super. Ct.), attached as Ex. 2.

10.     Further, the Federal Trade Commission has also brought an enforcement action against Yellowstone, alleging that the company makes systemic misrepresentations to and defrauds merchants. *Federal Trade Commission v. Yellowstone Capital LLC et. al*. Case No. 20-cv-6023 (S.D.N.Y.), attached as Ex. 3.

11.     As a direct result of the conduct exemplified by this class action, the New York State Legislature banned the use of confessions of judgment on out-of-state victims like Plaintiffs here.  The Financial Services Committee of the United States House of Representatives has gone further and passed a bill that would outright ban the use of confessions of judgment nationally.

12.     Plaintiffs now bring this action in order to stop the Enterprise's unlawful predatory lending and to remunerate the many hundreds of victims that have been preyed upon by Defendants through this county's court system.

## THE PARTIES

13.     Plaintiff NRO Boston, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114.

14.     Plaintiff NRO Edgartown, LLC is a Massachusetts corporation with its principal place of business located at 4 Dock Street, Edgartown, Massachusetts 02539.

15.     Plaintiff Alice Indelicato is an individual who is a citizen of Massachusetts and resides at 3 Oakdale Lane, Edgartown, Massachusetts  02539.

16.     Plaintiff Jason Indelicato is an individual who is a citizen of Massachusetts and resides at 3 Oakdale Lane, Edgartown, Massachusetts 02539.

17.     Defendant Yellowstone Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Jersey City, New Jersey 07302. Its LLC members are citizens of Delaware, New Jersey and/or New York.

18.     Defendant David Glass in an adult resident and citizen of Florida who resides at 200 E. Las Olas Blvd, STE 1600, Fort Lauderdale, FL 33301.

19.     Defendant Yitzhak D. Stern (a.k.a. Isaac Stern) is an adult resident and citizen of New Jersey who resides at 220 Surrey Rd., Hillside, NJ 07205.

20.     Upon information and belief, each of the John and Jane Doe Investor Defendants is a citizen of New York or New Jersey.

## JURISDICTION

21.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

22.     Venue is proper because the judgments by confession were entered in this county.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry

23.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times

higher than a bank's."[3]  The MCA industry is a breeding ground for "brokers convicted of stock

scams, insider trading, embezzlement, gambling, and dealing ecstasy."[4]  As one of these brokers

admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from

brokerage.  There's no license you need to file for.  It's pretty much unregulated."[5]

24.     The National Consumer Law Center also recognized that these lending practices

are predatory because they are underwritten based on the ability to collect, rather than the ability

of the borrower to repay without going out of business.  National Consumer Law Center, *supra*.

25.     This is because MCA companies "receive the bulk of their revenues from the

origination process rather than from performance of the loan [and thus] may have weaker

incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.*

("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to

prospective borrowers who simply cannot afford the credit on the terms being offered.

Typically, such credit is underwritten predominantly on the basis of liquidation value of the

collateral, without regard to the borrower's ability to service and repay the loan according to its

terms absent resorting to that collateral.").

26.     The MCA companies only care about whether they can collect upon default, and

not whether the small business can survive.

**B.     <u>The Yellowstone Umbrella</u>**

27.     Yellowstone was co-founded in 2009 by David Glass, an inspirational character

for the movie "Boiler Room."

---

[3] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG
(Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-
risk-in-high-interest-loans.
[4] *Id.*
[5] *Id.*

28.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."

29.     Defendant Stern, the CEO of Yellowstone, is David Glass' brother-in-law.

30.     Just like the movie, Yellowstone utilizes high pressure boiler room tactics by employing salespersons with absolutely no financial background whatsoever.

31.     In fact, Yellowstone's number one funder, who is dubbed "the Closer," has no financial experience whatsoever.  Rather, his apparent expertise came from working for Verizon, as a customer sales representative.  He now generates over $47 million in funding a year.[6]

32.     Stern actively solicits and recruits these boiler room salespersons on his personal social media websites.

33.     Although many of these high pressure sales pitches use the promise of helping these small businesses grow, in reality, all they do is fatten the pockets of the Enterprise.

34.     In addition to charging unlawful interest, the scheme is designed to trap the small businesses in a never-ending spiral of debt similar to payday lending where the small business has to take out additional loans to pay off the prior one.

35.     Since being founded in 2009, Yellowstone has expanded its umbrella to include numerous other MCA companies that operate under its management and control but exist under other corporate names.  These MCA companies include Advance Merchant, LLC, Arch, Capital Advance Services, LLC, Capital Merchant Services, LLC, HSC, World Global Capital, LLC, Green Capital Funding, LLC, Merchant Funding Services, LLC, and YCW.  With the exception of Arch, each of these other MCA companies use the same location of 30 Broad Street, 14th

---

[6]  deBanked, The Closer – Meet the Yellowstone Capital Rep that Originated $47 Million in Deals Last Year, dated Feb. 10, 2016.

Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters at 1 Evertrust Plaza, Jersey City, New Jersey 07302.

36.     Although each of these MCA entities operates out of New Jersey, they were strategically organized under the laws of New York so that they could utilize New York's confession of judgment statute and post-judgment collection devices.

37.     In addition to its fleet of MCA companies, Yellowstone utilizes a vast network of Independent Sales Offices ("ISOs") and brokers to sell their criminally usurious loans.

38.     In 2017, Yellowstone and its related companies issued over $400 million in loans.

**C.     The Investors**

39.     On January 16, 2015, the Enterprise, through Stern, entered into an agreement with various investors for the sole purpose of funding the Enterprise's unlawful loansharking scheme (the "Pinnex Agreement").

40.     The Pinnex Agreement provided over $55 million to fund the Enterprise.

41.     Stern personally contributed over $20 million.

42.     Although the Pinnex Agreement does not identify Glass as an investor, on information and belief, Glass is a silent investor through Stern.

43.     On information and belief, through the Pinnex Agreement, the Investors became aware of the true nature of Yellowstone's business: namely, that it treated its agreements as absolutely repayable loans.

44.     The other potential John and Jane Doe investors that provided funding to the Enterprise are Pinnex Capital Partners LLC, Redwood Investments Group, Inc., Steve Cramer, Jeff Reece, Chris Clarke, Moshe Mandelbaum, Robin Spence, and Steve Weinrib.

**D.     Yellowstone and its Employees Admit That its MCA Agreements are Loans**

Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 10 of 44

45.     In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

46.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

47.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

48.     Yellowstone targets small businesses in need of "a loan":



49.     Yellowstone employees, including, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

50.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

51.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

52. Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

53. The actors in the videos were all employees of Yellowstone.

54. The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

55. One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[7]

56. This video is titled "Bad Credit Business Loans ᵀᴹ | 855-445-9649." *Id.*

57. The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account. *Id.* This video clearly targeted these loans for personal consumer use.

58. Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head. The only way out was to get a business loan. So I went to the bank and when they ran my credit, the lady laughed at me**. So I went online and found Yellowstone Capital. I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.** It's crazy because my heartrate is higher than my credit score. So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse. *Id.* (emphasis added).

59. Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

60. As the video played, subtitles described Yellowstone's MCA program:

---

[7] EZBusinessLoans, *Bad Credit Business Loans ᵀᴹ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**<u>Our business loans</u>** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **<u>bad credit business loan</u>** application today! *Id.* (emphasis added).

61. These videos all link to a loan application on Yellowstone's website. *Id.*

62. On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[8]

63. The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues. With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **<u>a simple loan</u>** is at your disposal despite FICO score. We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com *Id.* (emphasis added).

64. Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

---

[8] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

**D.     The MCA Agreements Are Substantively And Procedurally Unconscionable.**

65.     The Enterprise agreements (the "MCA Agreements"), including those entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

66.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions (collectively, the "Transactions"), including those involving the Plaintiffs, are really loans.

67.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

68.   The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.   Among these knowingly false statements are that:   (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

69.   The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

70.   The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.   Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

### E.   The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.

71.   In order to evade state usury laws, the Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

72.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

73.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

74.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

75.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

76.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**E.     The Enterprise Intentionally Disguised the True Nature of the Transaction.**

77.     Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

13

(b)    The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)    While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)    The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)    The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)    The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)    The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)    The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## THE UNDERLYING NRO TRANSACTIONS

**A.     North River Outfitters, Alice Indelicato and Jason Indelicato.**

78.     NRO Boston and NRO Edgartown (collectively "NRO") are clothing and sports retailers in Beacon Hill, Martha's Vineyard, Nantucket and Wellesley, Massachusetts.

79.     It is owned by Alice Indelicato and is operated with her husband, Jason Indelicato.

80.     NRO has operated in Massachusetts since at least 2010.

81.     In or around 2014, NRO was growing so fast that it needed additional financing.

82.     NRO was solicited by two brokers, Jason Leak and Mike Martin, who promised the necessary capital to help the business grow and prosper.

83.     The MCA loans started out small but soon began to spiral out of control.

84.     Due to the unlawful high interest charged, NRO was soon forced to take out new MCA loans to pay off the prior ones.

**B.     The Enterprise Loans to NRO.**

**The First Usurious Loan Charging 507% Simple Interest**

85.     On February 23, 2016, NRO entered into its first MCA loan with Yellowstone.

86.     The loan amount was $100,000 and the principal and interest was $145,900.

87.     While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

88.     As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 90 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $1,621 per day.

Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 18 of 44

89.     In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $1,621 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

90.     As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 18 weeks, which would have resulted in a simple interest rate in excess of 133%.

91.     The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just 33 days later for the privilege of taking out yet another usurious loan with the Enterprise.

92.     The unconscionable interest rate on this loan was in excess of 507%.

**The Second Usurious Loan Charging 133% Simple Interest**

93.     On March 11, 2016, NRO entered into its second MCA loan with Yellowstone.

94.     The loan amount was $60,000 and the principal and interest was $87,540.

95.     While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

96.     As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 90 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $973 per day.

97.     In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $973 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

16

98.     As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 18 weeks, which would have resulted in a simple interest rate in excess of 133%.

### The Third Usurious Loan Charging 335% Simple Interest

99.     On March 28, 2016, NRO entered into its third MCA loan with Yellowstone.

100.    The loan amount was $210,000 and the principal and interest was $306,390.

101.    While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

102.    As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 100 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $3,064 per day.

103.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $3,064 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

104.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 20 weeks, which would have resulted in a simple interest rate in excess of 120%.

105.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just 50 days later for the privilege of taking out yet another usurious loan with the Enterprise.

106.    The unconscionable interest rate on this loan was in excess of 335%.

### The Fourth Usurious Loan Charging 390% Simple Interest

107.     On May 17, 2016, NRO entered into its fourth MCA loan with Yellowstone.

108.     The loan amount was $100,000 and the principal and interest was $145,900.

109.     While on its face, NRO Edgartown was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

110.     As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in twenty-two weeks through 110 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $1,327 per day.

111.     In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $1,327 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

112.     As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 22 weeks, which would have resulted in a simple interest rate in excess of 109%.

113.     The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just 43 days later for the privilege of taking out yet another usurious loan with the Enterprise.

114.     The unconscionable interest rate on this loan was in excess of 390%.

### The Fifth Usurious Loan Charging 558% Simple Interest

115.     On May 17, 2016, NRO entered into its fifth MCA loan with Yellowstone.

116.     The loan amount was $250,000 and the principal and interest was $364,750.

INDEX NO. 037005/2019
RECEIVED NYSCEF: 01/19/2021

117.    While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

118.    As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 110 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $3,316 per day.

119.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $3,316 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

120.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 22 weeks, which would have resulted in a simple interest rate in excess of 109%.

121.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just 30 days later for the privilege of taking out yet another usurious loan with the Enterprise.

122.    The unconscionable interest rate on this loan was in excess of 558%.

**The Sixth Usurious Loan Charging 507% Simple Interest**

123.    On June 16, 2016, NRO entered into its sixth MCA loan with Yellowstone.

124.    The loan amount was $270,000 and the principal and interest was $499,990.

125.    While on its face, NRO Edgartown was to repay the loan based on 15% of its daily receivables, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

19

126.     As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 84 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $5,995 per day.

127.     In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $5,995 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

128.     As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in 22 weeks, which would have resulted in a simple interest rate in excess of 143%.

129.     The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just  days later for the privilege of taking out yet another usurious loan with the Enterprise.

130.     The unconscionable interest rate on this loan was in excess of 507%.

**The Seventh Usurious Loan Charging 620% Simple Interest**

131.     On June 29, 2016, NRO entered into its seventh MCA loan with Yellowstone.

132.     The loan amount was $270,000 and the principal and interest was $409,738.

133.     While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months.   The Enterprise unilaterally included this term to disguise the true nature of the transaction.

134.     As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 117 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $3,499 per day.

20

135.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $3,499 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

136.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in 22 weeks, which would have resulted in a simple interest rate in excess of 143%.

137.    The actual interest rate charged and received by the Enterprise, however, was even worse because the Enterprise required NRO to pay off the loan early just 27 days later for the privilege of taking out yet another usurious loan with the Enterprise.

138.    The unconscionable interest rate on this loan was in excess of 620%.

**The Eighth and Ninth Usurious Loans Charging 195% Simple Interest**

139.    On July 26, 2016, NRO Boston and NRO Edgartown entered into two more identical MCA loans with Yellowstone.

140.    The loan amount was $400,000 and the principal and interest was $699,950.

141.    While on its face, NRO Boston was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months.    The Enterprise unilaterally included this term to disguise the true nature of the transaction.

142.    As expressly negotiated by the parties in advance, NRO Boston was to repay the loan in eighteen weeks through 100 fixed daily payments.  This negotiated amount is reflected in an Addendum to the loan, which fixes the payments at $6,995 per day.

21

143.    In order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $6,995 per day is a good-faith estimate of 15% of NRO Boston's daily receivables.

144.    As negotiated by the parties, the Enterprise intended to charge and collect the full repayment amount in exactly 20 weeks, which would have resulted in a simple interest rate in excess of 195%.

**The Alleged Default and Confession of Judgment**

145.    In or around late July 2016, NRO fell behind on its onerous daily payments and one of its other predatory MCA lenders, Saturn Funding LLC, froze NRO's Massachusetts based bank accounts through an unlawful levy by a New York City marshal.

146.    As a result of this action, NRO informed Yellowstone that it could not make the required daily payments under the two July 26, 2016 MCA loans.

147.    In response, Yellowstone through Davis directed NRO to open up a new corporation, and to open up new bank accounts in order to repay Yellowstone.  In other words, Yellowstone wanted NRO to engage in a fraudulent conveyance to defraud its other legitimate creditors.

148.    When NRO refused to engage in this fraudulent scheme, Yellowstone filed two confessions of judgment against NRO Boston, NRO Edgartown, and Alice Indelicato personally on September 22, 2016.

CLASS ALLEGATIONS

149.    Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

150.    Plaintiffs bring this action pursuant CPLR §§ 901-909.

Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 25 of 44

151.     Plaintiffs NRO Boston and NRO Edgartown bring this action individually and on behalf of classes of similarly situated persons defined as follows:

152.     **Merchant Judgment Class:**  All persons in the United States who, on or after December 13, 2013 had a judgment of confession entered against them in Rockland County by the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

**RICO Merchant Subclass:**  All persons in the United States who, on or after December 13, 2015 paid money to the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

153.     Plaintiffs Alice and Jason Indelicato bring this action individually and on behalf of classes of similarly situated persons defined as follows:

**Principal Judgment Class:**  All persons in the United States who, on or after December 13, 2013, individually as a principal, had a judgment of confession entered against them in Rockland County by the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

**RICO Principal Class:**  All persons in the United States who, on or after December 13, 2015, individually as a principal, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

154.     The following people are excluded from the Classes and Subclasses: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes and Subclasses; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived, unless that final adjudication, release, or waiver consists solely of a confession of judgment entered within Rockland County; (5)

Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

155.    **Numerosity**:  The exact number of members of the Classes and Subclasses is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes and Subclasses likely numbers in the hundreds.

156.    **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class and Subclass members, and those questions predominate over any questions that may affect individual members of the Class and Subclasses. Common questions for the Class and Subclasses but are not limited to the following:

     a.     Whether the MCA Agreements are loans;

     b.     Whether the MCA Agreements are usurious;

     c.     Whether the MCA Agreements are void;

     d.     Whether Plaintiffs and the Classes may recover any moneys or property paid to the Enterprise pursuant to the MCA agreements; and

     e.     Whether Defendants' conduct was willful or knowing.

157.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes and Subclasses. Plaintiffs and members of the Classes and Subclasses sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes and Subclasses.

158.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes and Subclasses, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no

interests antagonistic to those of the Classes and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and Subclasses, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes and Subclasses.

159. **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes and Subclasses are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes and Subclasses to obtain effective relief from Defendants. Even if members of the Classes and Subclasses themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
#### (RICO: 18 U.S.C. § 1962)

#### By Plaintiffs and the Classes against
#### Yitzhak Stern, David Glass, and the John and Jane Doe Investors

160. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Unlawful Activity.**

25

161.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

162.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

163.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

164.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

165.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

166.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

167.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

168.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

169.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

170.    Glass, Stern, and the John and Jane Doe Investors are  "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

171.    At all relevant times, each of Glass, Stern, and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

172.    Glass has an ownership interest in Yellowstone and is the mastermind of the Enterprise.

173.    Stern has an ownership interest in Yellowstone, and was the Chief Executive Officer of Yellowstone at all relevant times.

174.    Through their operation of Yellowstone, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.      The Enterprise.**

175.    Yellowstone, alongside its collection agent, MCA Recovery, constitutes (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

176.    Yellowstone and MCA Recovery are associated  in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting

27

upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

177.    Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including NRO.

178.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

179.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    Defendant Glass**

180.    Upon information and belief, Glass is an owner and the mastermind of the Enterprise.  Together with Stern, Glass is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to NRO.

181.    In his capacity as the mastermind of the Enterprise, Glass, together with Stern, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to NRO and the Classes and Subclasses.

182.    Glass has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

183.    While Glass purports to have divested from Yellowstone prior to the transactions at issue, Glass in fact maintained an interest, operating the company through Defendant Stern.

184.    In February 2016, while NRO Boston was still engaged in substantial business with Defendant Yellowstone, another member of the Yellowstone umbrella of companies, Arch Capital Funding ("Arch") issued a UCC-1 lien against the assets of NRO Boston. Mr. Indelicato contacted Jake Winograd, his contact at Yellowstone, to arrange for the UCC-1 lien to be removed. On February 10, 2016, Mr. Winograd sent an email Doug Kutzgar. Eli Guree and

29

Carlos Jimenez at Arch Capital, carbon-copying Eli Guree's Yellowstone email address, directing the UCC-1 lien be terminated: Ex. 4.

185.    Within ten minutes of the first email, Carlos Jimenez sent a brief t brief responsive email reading simply "Ucc terminated" to the original sender and recipient, but carbon-copied two additional parties: Davis, and **David Glass**, at the email Glassysc@gmail.com. *Id.* Notably, while Glass's email is not a Yellowstone email address, it contains the letters "ysc"—an abbreviation for Yellowstone Capital. *Id.*

186.    Additionally, Glass's continued involvement in the management of Yellowstone is evidenced by a January 17, 2019 text message exchange with Davis, regarding Davis's desire to divest himself of Yellowstone equity, Ex. 5:

> DAVIS: Hey I'm looking to get rid of my equity of Yellowstone. I'm looking into my options of selling it and have some intrest [sic] from some people. Any intrest [sic] in taking it over and saving all the trouble?
> Glass: Are you familiar with a local governmental employee call [sic] the NEW YORK STATE ATTORNEY GENERAL?
> DAVIS: lol
> DAVIS: Yes
> GLASS: I'm on a flight
> GLASS: Call u after
> DAVIS: Ok what's the prob with all of that?
> DAVIS: I don't think it's in anyone's best intrest [sic] for me to have eq
> DAVIS: So I got to see what my options are to sell it
> GLASS: we are living on different planets. you are trying to cash out and we are hoping to not be charged
> GLASS: I doubt you have any options right now
> GLASS: Let's see if we can get thru this
> DAVIS: Not looking to cash out and win the lottery. Looking to cut ties and get discounted price for it. Or try to get someone else to buy in which obviously you have first right and tag along options but looking at all options and not looking to wait months to do it
> GLASS: Probably best u wait for the IPO no?
> DAVIS: Lol
> DAVIS: I'm not a fan of penny stocks
> GLASS: The company is up to its *** in lawsuits and government investigations. The industry is under a microscope. There is no market

INDEX NO. 037005/2019
RECEIVED NYSCEF: 01/19/2021
Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 33 of 44

for these shares at all. All there is now is unlimited personal liability all around.

187.   Glass has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, Stern, MCA Recovery and to the Investors of the deals in which he has personally participated.

**ii.   Defendant Stern**

188.   Stern is an owner of Yellowstone and was its Chief Executive Officer at all relevant times.  Together with Glass, Stern is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to NRO and the Classes and Subclasses.

189.   In his capacity as the day-to-day leader of the Enterprise, Stern, together with Glass, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to NRO and the Classes and Subclasses.

190.   Stern has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including

directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

191.  Stern has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, MCA Recovery, Glass, and to the Investors of the deals in which he, upon information and belief, has personally participated.

### iv.  Defendant Yellowstone

192.  Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of MCA Recovery and the Investors.

193.  Glass, Stern, and the Investors have operated Yellowstone as part of an unlawful enterprise to collect upon unlawful debt. Pursuant to its membership in the Enterprise, Yellowstone has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

194.  In this case, Yellowstone: (i) solicited borrowers, including NRO; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of NRO; and (vi) upon the alleged default by

NRO, directed MCA Recovery to obtain a Judgment in Yellowstone's name and collect upon the unlawful debt evidenced therein.

### v.      The Investors

195.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Yellowstone and MCA Recovery.

196.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

197.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### viii.      Non-Party MCA Recovery

198.    MCA Recovery is a debt collection company.  It is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of the Investors and Yellowstone.

199.     Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the Defendants' direction, MCA Recovery prepares affidavits for execution by employees of Yellowstone that falsely represent the transactions constitute the sale and purchase of future receivables in order to

Case 7:21-cv-03652-PMH Document 1-60 Filed 04/23/21 Page 36 of 44

conceal the usurious and unlawful nature of the transactions and induce Courts of New York and elsewhere to enter judgments in favor of Yellowstone, including the Judgment entered against NRO and the Classes and Subclasses.

200. Together with these affidavits and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, MCA Recovery has filed hundreds, if not thousands, of Affidavits of Confessions with the Clerks of the Courts of New York. In reliance upon the false affidavits of Davis and other employees of Yellowstone, the Clerks of the Courts of New York enter judgments in favor of Yellowstone that, based upon the representations made by Yellowstone in the supporting affidavits, include not only the outstanding sums of principal and usurious interest allegedly due and owing under the loans, but also fees for attorneys' services that have not, and may never be, rendered.

201. In this case, on September 22, 2016, upon NRO Boston's and NRO Edgartown's alleged default under the July 26, 2016 agreements with Yellowstone (the "July 2016 Agreements"), at Yellowstone officer Steven Davis' direction, MCA Recovery prepared an affidavit that intentionally misrepresented the nature of the transaction as the sale of receivables in order to induce the Clerk of Supreme Court of New York, County of Rockland, to enter a judgment against Plaintiffs on account of the unlawful debt, which he did. The affidavit, signed by Davis, also intentionally misrepresented that NRO had breached the July 2016 Agreement by blocking access to the account and that Alice Indelicato was personally liable under the July 2016 Agreement because NRO had breached the July 2016 Agreement.

202. MCA Recovery was fully aware that the Davis Affidavit was made pursuant to the collection of an unlawful debt, because it was generally aware of the Enterprise's scheme.

Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 37 of 44

203. Specifically, as alleged by the New Jersey Attorney General, on at least one occasion, MCA Recovery refused to accommodate a merchant's request to lower daily payments due to a cash flow issue, indicating that MCA Recovery treated the agreements as absolutely repayable. Ex. 2 ¶ 57(b).

204. On December 12, 2016, in a further effort to collect upon the unlawful debt and accomplish the goals and purpose of the Enterprise, MCA Recovery directed a New York City Marshal, Vadim Barbarovich, to unlawfully serve a Levy and Demand on First Commons Bank despite knowing that any funds held by NRO were held at its local branch in Massachusetts.

### E.    Interstate Commerce

205. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

206. Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Massachusetts, including NRO, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

207. In the present case, all communications between the members of the Enterprise, NRO were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

208. In addition, at the direction of Yellowstone, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements and the applicable

Confession Affidavits were sent from Massachusetts to Yellowstone at their offices in New Jersey via Federal Express using labels prepared by Yellowstone.

### F.     Injury and Causation.

209.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

210.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

211.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

212.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

### By Plaintiffs and the Classes against
### Yitzhak Stern, David Glass, and the John and Jane Doe Investors

213.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

214.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

215.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email

36

INDEX NO. 037005/2019
RECEIVED NYSCEF: 01/19/2021

communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

216.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

217.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

218.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

219.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments and the unlawful entry and enforcement of judgments.

220.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

221.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.  The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt, including the Agreements.

Case 7:21-cv-03652-PMH Document 1-60 Filed 04/23/21 Page 41 of 44

### THIRD CAUSE OF ACTION
### (Vacatur of Judgments under CPLR § 5015 based on fraud, unconscionability, and other misconduct)

**By Plaintiffs, the Merchant and Principal Judgment Subclasses, Against Yellowstone Only**

222. Plaintiffs and the Classes repeat and re-allege the allegations set forth above.

223. In support of its application for entry of the NRO Boston and NRO Edgartown judgments, Yellowstone submitted two affidavits from Davis, dated September 21, 2016.

224. In his affidavit, Davis represented that Yellowstone had "bought" all of NRO Boston's and NRO Edgartown's future receivables having a face value of $699,950 pursuant to the July 26, 2016 Agreements in what the Davis Affidavit implies was an arms-length sale.

225. Such statements in the Davis Affidavit were false and misleading.

226. The transactions between NRO and Yellowstone, including the July 26, 2016 Agreement, were not purchases of future receivables but, rather, they were disguised as such to conceal the fact that Yellowstone had made usurious and unenforceable loans to NRO that charged interest at rates far in excess of the maximum rate of twenty-five percent (25%) that may be charged to a corporation under New York's usury laws.

227. In July 26 2016 Agreements, Yellowstone knew that NRO desperately needed funding to meet its daily operating needs, repay the prior agreements with Yellowstone and satisfy obligations to other creditors, including other merchant cash advance companies, and it unconscionably took advantage of NRO's financial condition to extract a usurious interest rate and other unconscionable terms that shifted all risk and obligations under the agreements to NRO while forcing NRO to waive their right to a jury trial; pay Yellowstone's attorney fees; waive its right to participate in a class action; waive their right to seek legal redress in their home state; grant Yellowstone a security interest in substantially all of their assets; grant Yellowstone a

power of attorney over the NRO's assets; limit damages in the event of Yellowstone's breach of the Agreements; and indemnify Yellowstone for claims arising of out of the agreements.

228.    Yellowstone knew that the Davis Affidavit contained false and misleading statements, but, nevertheless, submitted the affidavit to the Court in order to induce the clerk of this Court to enter the Judgments, which it did.

229.    Further, the affidavit was filed pursuant to a RICO scheme to collect upon unlawful debt.

230.    Pursuant to CPLR 5015(a)(3) and/or the inherent powers of this Court, the Judgments should be vacated on the grounds of fraud, misrepresentation, unconscionability and/or misconduct by Yellowstone.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)    Declaring each of Plaintiffs' and the Class' agreements with Yellowstone to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

c)    As to Yellowstone only, vacating the Judgments by Confession;

d)    Permanently enjoining Defendants from engaging in the unlawful conduct described above, including entering into or collecting on any further usurious loan agreements;

e)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined a trial;

f)    Awarding double and/or treble damages as the Court deems appropriate;

g)    Requiring Defendants to pay Plaintiffs' and the Classes' attorneys' fees and costs; and

Case 7:21-cv-03652-PMH   Document 1-60   Filed 04/23/21   Page 43 of 44

h)      Any further relief deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class Members demand a trial by jury on all issues properly so tried.

Dated: January 19, 2021

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
Justin E. Proper
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs and the Putative Classes and Subclasses*

42

26471236v.1